1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                   NORTHERN DISTRICT OF CALIFORNIA

7

8    KARL FINLEY,                              No. C-07-5922 EMC

9            Plaintiff,

10      v.                                     **ORDER GRANTING DEFENDANT'S
                                               MOTION FOR SUMMARY JUDGMENT**
11   COUNTY OF MARTIN, *et al.*,
                                               **(Docket No. 94)**
12           Defendants.
     _____/

13

14

15       Plaintiff Karl Finley has filed an employment discrimination complaint against Defendant

16   the County of Marin.  Currently pending before the Court is the County's motion for summary

17   judgment.  Having considered the parties' briefs and accompanying submissions, as well as all other

18   evidence of record, the Court hereby **GRANTS** the County's motion.

19                      **I.    FACTUAL & PROCEDURAL BACKGROUND**

20       The evidence of record submitted by the parties in conjunction with the motion for summary

21   judgment, and viewed in Plaintiff's favor, reflects as follows.[1]

22       Mr. Finley is African American.  He began working for the County in or about 1997 as a

23   Detention Registered Nurse in the Health & Human Services Department ("HHS").  *See* Finley

24   Decl. ¶ 7.

25

26

27   _____

28       [1] Both the County and Mr. Finley have submitted objections to certain evidence tendered by
     other party.  *See* Docket No. 115 (County's objections); Docket No. 118 (Mr. Finley's objections).  The
     Court shall address objections as necessary in this opinion.  All other objections are moot.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

In 1999, the County hired Mr. Finley as a Detention Nursing Supervisor.  *See* Finley Decl. ¶ 2; *see also* Martinez Decl. ¶ 13.[2]  Mr. Finley was hired over several candidates, one of which was Marsha Grant, *see* Martinez Decl. ¶ 13[3]; Grant Decl. ¶ 7, the white woman who is the focus of Mr. Finley's complaint regarding a later promotion in 2006.  Mr. Finley's new position was at the juvenile hall rather than the adult jail facility.  *See* Grant Decl. ¶ 7.

In or about 2000, Mr. Finley applied for a promotion to the position of Chief of Detention Nursing Services.  Mr. Finley was not hired for this position.  *See* Finley Decl. ¶ 3; Martinez Decl. ¶ 14.[4]

In 2006, Mr. Finley applied for a promotion to Nurse Manager Detention Services, which was essentially the same promotion he had sought in 2000 but with a different name.  *See* Finley Depo. at 83.  The hiring authority for the position was Frima Stewart, who at the time was the Director of the Division of Public Health.  *See* Stewart Decl. ¶ 3.

Three people applied for the position, including Mr. Finley and Ms. Grant.  The third candidate was determined not to meet the minimum qualifications for the job.  *See* Martinez Decl. ¶

---

[2] Mr. Finley has objected to this part of the Martinez declaration.  *See* Docket No. 118 (Obj. No. 9).  However, this objection – as well as all other objections submitted by Mr. Finley – was not timely made.  The briefing on the motion for summary judgment closed on November 25, 2009.  *See* Docket No. 110 (order).  Mr. Finley did not file his objections until December 3, 2009.  This was in violation of Civil Local Rule 7-3(d), which provides that, "once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval."  Civ. L.R. 7-3(d).  Here, Mr. Finley did not ask for Court approval to file his objections past the filing date of the reply brief.

Even if Mr. Finley had asked for leave to file his objections, the Court would have denied the request.  Mr. Finley is making objections to evidence that the County submitted back when it filed its motion for summary judgment on November 3, 2009.  There is no good reason why Mr. Finley should not have filed his objections when he filed his opposition to the summary judgment motion on November 19, 2009.  At the very least, Mr. Finley should have been able to file the objections by the date the County filed its reply on November 25, 2009.  Accordingly, the Court overrules this objection, as well as all other objections, made by Mr. Finley.

As a final point, the Court notes that Mr. Finley's objection to this part of Ms. Martinez's declaration is effectively moot since he himself concedes that he was hired in 1999 as the Nursing Supervisor.

[3] Mr. Finley has objected to this part of the Martinez declaration.  Because the objection was not timely made, it is overruled.  *See* note 2, *supra*.

[4] Mr. Finley has objected to this part of the Martinez declaration.  Because the objection was not timely made, it is overruled.  *See* note 2, *supra*.  Moreover, the objection is effectively moot since Mr. Finley concedes that he applied but was not hired for this position.

United States District Court
For the Northern District of California

7[5]; Martinez Depo. at 15.  Accordingly, only Mr. Finley and Ms. Grant were referred to a panel for a selection interview.

The County does not have a set policy as to who is allowed to sit on a selection interview panel.  That decision is made by the manager in charge of filling the position and his or her designees.  *See* Martinez Decl. ¶ 9.  In the instant case, it appears that Ms. Stewart designated Diane Stoker (now Beetham) to make this decision.  *See* Brown Decl., Ex. I at 10 (interview of Ms. Stoker by Ms. Daube) (stating that she personally made the decision as to who was going to sit on the panel).[6]  Ms. Stoker was at the time the Clinical Services Administrator and Director of Nursing for the County.  *See* Stoker Decl. ¶ 2.  She was to be the supervisor of whichever applicant was ultimately promoted.  *See* Stoker Decl. ¶ 6.

The panel that Ms. Stoker composed consisted of four persons: (1) Ms. Stoker herself, *see* Stoker Decl. ¶ 3; (2) Tim Lepinski, who at the time was a County sheriff deputy working in jail operations, *see* Lepinski Decl. ¶¶ 2-3; (3) Jackie Clark, a registered nurse who at the time was an outside consultant for the County in connection with its efforts to cut costs, *see* Clark Decl. ¶¶ 2-3, 6; and (4) Jane Robinson, another County "outsider."  *See* Robinson Decl. ¶¶ 3-5.  It is undisputed that Ms. Robinson had experience in nursing at the time that the interviews were conducted although

---

[5] Mr. Finley has objected to this part of the Martinez declaration.  Because the objection was not timely made, it is overruled.  *See* note 2, *supra*.  Furthermore, the Court notes that the objection is essentially moot.  Mr. Finley's specific objection is to Ms. Martinez's testimony about who the third person was and why she did not allegedly satisfy the minimum qualifications.  This specific evidence is not being considered by the Court.

[6] Mr. Finley has submitted as evidence transcripts of audiotapes which contain witness interviews conducted by Linda Daube, an attorney hired by the County to investigate Mr. Finley's discrimination complaint.  The County has objected to all of the transcripts.  *See* Docket No. 115 (Obj. at 28).

The County's authenticity objection is overruled.  Even if the audiotapes were produced by Ms. Daube, a third party, in response to a subpoena – and not the County, as Mr. Finley's counsel states in his declaration – that fact is enough to establish that the tapes are authentic for purposes of summary judgment.  If the County had wanted to challenge the reliability of the transcription itself, it could have done so.

Likewise, the County's hearsay objection is overruled.  Under Federal Rule of Evidence 801(d)(2), an admission by a party-opponent is not hearsay.  An admission by a party-opponent includes "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).

United States District Court

For the Northern District of California

1    it is not clear exactly what her experience was at the time.  It is also undisputed that Ms. Clark

2    contacted Ms. Robinson about serving on the panel and that Ms. Clark recommended Ms. Robinson

3    as the fourth person on the selection interview panel.  *See* Robinson Decl. ¶ 3; Clark Decl. ¶ 6.

4          According to Ms. Stoker, she did not take notes with respect to the interviews of Mr. Finley

5    and Ms. Grant nor did she rate the applicants because she was to be the supervisor of whoever would

6    be promoted and felt it best that she maintain a neutral role until after the other panelists had given

7    their impressions.  *See* Stoker Decl. ¶ 6.  Ms. Stoker maintains that it was the "unanimous view of

8    the other panelists that Marshal Grant was better qualified" and she agreed with that view.  Stoker

9    Decl. ¶ 6.

10         According to Ms. Robinson, she felt Ms. Grant was the better candidate and accordingly

11   gave Ms. Grant higher scores compared to Mr. Finley.  *See* Robinson Decl. ¶ 5 & Exs. 1-2 (scores).

12         According to Lt. Lepinski, he also felt Ms. Grant was the better candidate and therefore gave

13   her higher scores.[7]  *See* Lepinski Decl. ¶¶ 4-5, 7 & Ex. 1 (scores).

14         Finally, like Ms. Robinson and Lt. Lepinski, Ms. Clark felt Ms. Grant was the stronger

15   candidate.  *See* Clark Decl. ¶¶ 7-8, 10.  However, Ms. Clark's scores were thrown out because,

16   shortly after the interview, Mr. Finley expressed to Ms. Stoker a concern about bias on the part of

17   Ms. Clark.  *See* Stoker Decl. ¶ 8 & Ex. 2 (e-mail exchange).  In an e-mail, Mr. Finley claimed that

18

19         [7] In his declaration, Mr. Finley claims that Lt. Lepinski told him that Ms. Stoker "refused to
20   acknowledge [Lt. Lepinski's] scores and notes, even though he offered them to [her]."  Finley Decl. ¶
     18.  The County has objected to this part of Mr. Finley's declaration.  *See* Docket No. 115 (Obj. No. 25).
21   The hearsay objection is overruled because any statement by Lt. Lepinski would be an admission of a
     party-opponent.  However, the County's objection that the phrase "refused to acknowledge" is vague
22   and ambiguous has merit.  This objection is therefore sustained.

23         Even if the Court were to overrule the latter objection and construe the statement to mean that
     Lt. Lepinski offered to give Ms. Stoker copies of his scores and notes but that she did not accept them,
24   there is no real benefit to Mr. Finley.  It is not possible to infer from the statement that Ms. Stoker must
     therefore have ignored Lt. Lepinski's opinion altogether because Lt. Lepinski's declaration and the
25   declarations of other panelists establish without dispute the contrary – *i.e.*, that there was a discussion
     amongst the panelists about the applicants.  *See, e.g.*, Lepinski Decl. ¶ 7("The other members of the
26   selection panel and I felt Marsha Grant was the better candidate of the two applicants."); Clark Decl.
     ¶ 8 ("The general consensus of the panelists was that Marsh[a] Grant had 'stepped up' to the task of
27   streamlining the provision of nursing services and cutting costs.  By contrast, Karl Finley seemed
     disengaged from the challenges and content to remain uninvolved in his position at the Juvenile Hall.");
28   Stoker Decl. ¶ 6 ("I agreed with the unanimous view of the other panelists that Marsha Grant was better
     qualified than Karl Finley for the position of Detention Nurse Manager.").

originally Ms. Clark was brought in to be the acting Chief Detention Nurse (*i.e.*, Nurse Manager Detention Services) but that, in a meeting with Ms. Stoker, Ms. Clark, Ms. Grant, and himself, he had protested this decision, after which a decision was made to change Ms. Clark's appointment to consultant. *See* Stoker Decl., Ex. 2; *see also* Finley Decl. ¶ 14 (claiming that he had "openly objected to Ms. Clark being retained by defendant as the Acting Nurse Manager" and that, "[a]s a result of my objections[,] Ms. Clark was not appointed as the Acting Nurse Manager" and was retained instead as a consultant).[8]  In the same e-mail, Mr. Finley also stated that Ms. Grant had previously told him that Ms. Clark was "'groom[ing] [Ms. Grant] to be the new Chief if [she] want[ed] it.'"  Stoker Decl., Ex. 2 (e-mail exchange).

Ms. Stoker verbally informed Ms. Stewart, the hiring authority, of the panel's recommendation.  *See* Stoker Decl. ¶ 9; Stewart Decl. ¶ 4.  Ms. Stewart agreed with the panel's recommendation and therefore accepted the recommendation and offered the position to Ms. Grant. *See* Stewart Decl. ¶ 4.  According to Mr. Finley, the offer was actually conveyed to Ms. Grant by Ms. Stoker, *see* Opp'n at 11, but there is no evidence to support such.[9]

Mr. Finley learned that he had not been selected for the position in July 2006, when he returned from a vacation.  *See* Finley Decl. ¶ 19.  That same day, Ms. Grant went to the juvenile hall where Mr. Finley worked and told him that he was going to be transferred to the adult jail facility in approximately a week.  *See* Finley Decl. ¶ 20; *see also* Grant Decl. ¶ 8.  According to the County, the transfer was "part of the necessary cost cutting processes to meet the budgetary demand," Grant Decl. ¶ 9, and was consistent with the recommendations of a 2005 report by an outside consultant, known as the "Page Report."  *See* Stoker Decl., Ex. 4 (Page Report).  One of the recommendations in the Page Report was to eliminate one Detention Nursing Supervisor and to consolidate the adult and juvenile facility supervision.  *See* Grant Decl. ¶ 7; *see also* Stewart Decl. ¶ 5 (noting that Page Report stated "there was no need for a supervising nurse at the juvenile hall"); Stoker Decl. ¶ 11

---

[8] The County has objected to this part of the Finley declaration.  The objection is overruled because it goes to the state of mind of a decisionmaker, Ms. Stoker.

[9] Mr. Finley cites the Martinez deposition in support of this claim but nowhere in the deposition does the witness state that Ms. Stoker made the offer.  *See* Martinez Depo. at 85.

United States District Court

For the Northern District of California

1  (noting that Page Report recommended that Detention Nursing Supervisor position at juvenile hall

2  be eliminated because too few nurses there to justify having manager on site).  Mr. Finley disputes

3  such.  More specifically, he asserts that the transfer was a retaliatory act.

## II.   DISCUSSION

### A.   Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

Where the plaintiff has the ultimate burden of proof, the defendant may prevail on a motion for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In the instant case, the County has moved for summary judgment on each of the claims asserted in the first amended complaint ("FAC").  Those claims are as follows:

(1)     Race harassment, in violation of Title VII and the California Fair Employment and Housing Act ("FEHA").

(2)     Race discrimination, in violation of Title VII and FEHA.

(3)     Retaliation, in violation of Title VII and FEHA.

(4)     Failure to prevent harassment and discrimination, in Title VII and FEHA.

(5)     Violation of 42 U.S.C. §§ 1981, 1983, and 1985, based on the First Amendment, the Equal Protection Clause, and the Due Process Clause.

United States District Court

For the Northern District of California

1    (6)    Violation of article I, § 7 of the California Constitution.

2    B.    <u>Race Discrimination</u>

3        In his race discrimination claim, Mr. Finley contends disparate treatment – *i.e.*, that the

4    County failed to promote him to the position of Nurse Manager Detention Services in 2006 based on

5    his race.

6        1.    <u>Legal Standard</u>

7        Under Title VII, it is an unlawful employment practice for an employer to refuse to hire a

8    person because of his race.  *See* 42 U.S.C. § 2000e-2(a)(1).  "In responding to a summary judgment

9    motion in a Title VII disparate treatment case, a plaintiff may produce direct or circumstantial

10   evidence demonstrating that a discriminatory reason more likely than not motivated the defendant's

11   decision, or alternatively may establish a prima facie case under the burden-shifting framework set

12   forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Dominguez-Curry v. Nev.*

13   *Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).

14           To make out a prima facie case under *McDonnell Douglas*, a
         plaintiff must show that (1) [he] belongs to a protected class; (2) [he]
15       applied for and was qualified for the position she was denied; (3) [he]
         was rejected despite [his] qualifications; and (4) the employer filled
16       the position with an employee not of plaintiff's class, or continued to
         consider other applicants whose qualifications were comparable to
17       plaintiff's after rejecting plaintiff.  At summary judgment, the degree
         of proof necessary to establish a prima facie case is "minimal and does
18       not even need to rise to the level of a preponderance of the
         evidence."[10]

19

20   *Id.*

21       Like Title VII, FEHA also makes it an unlawful employment practice for an employer to

22   refuse to hire a person because of his race.  *See* Cal. Gov't Code § 12940(a).  And as with Title VII,

23   _____

24       [10] In his opposition, Mr. Finley cites a 1978 opinion from the Eighth Circuit as to what
     constitutes a prima facie case, *see Haire v. Calloway*, 572 F.2d 632 (8th Cir. 1978), but this Court is
25   bound by Ninth Circuit and Supreme Court precedent, not Eighth Circuit precedent.  In any event, the
     Court notes that, in his opposition, Mr. Finley leaves out the fourth element of the prima facie case
26   under that Eighth Circuit case.  *See id.* at 634 (stating the elements of a prima facie case are as follows:
     "(i) that plaintiff belongs to a racial minority, (ii) that he was qualified for promotion and might have
27   reasonably expected selection for promotion under the defendant's on-going competitive promotion
     system, (iii) that he was not promoted, and (iv) the supervisory level employees having responsibility
28   to exercise judgment under the promotion system betrayed in other matters a predisposition towards
     discrimination against members of the involved minority").

United States District Court

For the Northern District of California

1   a plaintiff may make out a prima facie case of discrimination under FEHA based on the above four

2   elements.  *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 & n.21 (2000).

3           2.      Prima Facie Case

4           In the instant case, the County argues that Mr. Finley cannot establish even a prima facie

5   case.  This argument, however, is not persuasive.  Contrary to what the County asserts, there is

6   evidence suggestive of a discriminatory motive – *i.e.*, Mr. Finley was qualified for the position and

7   rejected, and the County filled the position of Nurse Manager with a person outside of the protected

8   class (Ms. Grant).  *See Dominguez-Curry*, 424 F.3d at 1037 (specifically stating that fourth element

9   of prima facie case may be met where employer fills position with person not in plaintiff's class).

10          3.      Nondiscriminatory Reason for Adverse Employment Action

11          Because there is sufficient evidence for Mr. Finley to make out a prima facie case of race

12  discrimination, "[t]he burden of production . . . shifts to the [County] to articulate a legitimate,

13  nondiscriminatory reason for its [failure to promote Mr. Finley]."  *Dominguez-Curry*, 424 F.3d at

14  1037.  The County has articulated such a reason and further has backed up that reason with

15  evidentiary support.  More specifically, the County has provided declarations from the members of

16  the selection interview panel (*i.e.*, Ms. Stoker, Lt. Lepinski, Ms. Clark, and Ms. Robinson), each of

17  whom testifies that he or she believed Ms. Grant to be the better candidate based on nonracial

18  considerations.  *See, e.g.*, Stoker Decl. ¶ 6 (noting that Ms. Grant had been serving as the acting

19  Nurse Manager for a year and claiming that she gave better answers to questions); Lepinski Decl. ¶¶

20  4-5, 7 (stating that "Marsha Grant's having held the position of interim Detention Nurse Manager

21  enabled her to better answer questions put to her regarding how she planned to do the job if she

22  received the promotion, whereas Karl Finley's answers were less on point"; also noting that Ms.

23  Grant had experience in the main jail whereas Mr. Finley's experience was with the juvenile hall);

24  Clark Decl. ¶¶ 5, 7-8 (stating that Ms. Grant had impressed her while acting as interim Detention

25  Nurse Manager; also stating that Ms. Grant seemed "willing to address the challenges of

26  streamlining the provision of nursing services to inmates at the jail" while Mr. Finley struck her "as

27  disengaged and resistant to putting in the time dedication needed to implement changes in the jail

28  system"); Robinson Decl. ¶ 5 (stating that Ms. Grant seemed "better prepared to hit the ground

**United States District Court**
For the Northern District of California

1    running" and that she answered questions better than Mr. Finley did). The County has also provided

2    a declaration from Ms. Stewart, the hiring authority, which states in essence that she deferred to the

3    recommendation of the panel and Ms. Stoker, who was the senior manager responsible for the

4    program. *See* Stewart Decl. ¶¶ 3-4; *see also* Stoker Decl. ¶ 9.

5          In his opposition, Mr. Finley argues that the Court should not consider the declarations from

6    the panelists because they contradict the deposition testimony of the County's Rule 30(b)(6) witness

7    on the selection process (*i.e.*, Victoria Martinez[11]). *See* Opp'n at 1; Martinez Depo. at 12. But Mr.

8    Finley has failed to show that the declarations and Ms. Martinez's testimony are in fact

9    contradictory. At her deposition, Ms. Martinez simply indicated that she did not have any firsthand

10   knowledge about the applicants' answers to the questions that led the panel to make its

11   recommendation. *See* Martinez Depo. at 65. This testimony clearly does not conflict with the

12   panelists' declarations which simply state the reasons underlying their recommendation. The Court

13   notes that Mr. Finley could have moved to compel on the basis that Ms. Martinez was not an

14   adequately prepared 30(b)(6) witness, but he did not do so. He also could have sought to take the

15   depositions of the panelists but did not do so.

16         4.   <u>Pretext</u>

17         The critical issue in the instant case thus becomes pretext – *i.e.*, whether is a genuine dispute

18   of material fact that the County's explanation for its failure to promote Mr. Finley is merely a

19   pretext for discrimination. In his opposition, Mr. Finley makes three arguments as to why the

20   County's explanation is pretextual:

21   (1)    Because he was the most qualified candidate and Ms. Grant failed to meet even the minimum

22           qualifications for the position as Nurse Manager;

23   (2)    Because the County failed to comply with its own internal policies and procedures during the

24           selection process; and

25   (3)    Because the County in general – and HHS in particular – has a pattern or practice of failing

26           to promote African American employees to the senior management ranks.

---

28         [11] Ms. Martinez is a senior personnel analyst in the County's Human Resources Department.
*See* Martinez Decl. ¶ 2.

United States District Court

For the Northern District of California

1    Each of these argument is addressed below.

2              a.    Qualifications

3         As noted above, Mr. Finley's first argument is that the County's explanation for its failure to

4    promote him is a pretext for race discrimination because he was the most qualified candidate and

5    Ms. Grant failed to meet even the minimum qualifications for the job.

6         The Ninth Circuit has stated that a plaintiff's "superior qualifications" standing alone are

7    enough to prove pretext.  *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th

8    Cir. 2003).  While the Ninth Circuit has emphasized that "we have *never* followed the Fifth Circuit

9    in holding that the disparity in candidates' qualifications 'must be so apparent as to jump off the

10   page and slap us in the face to support a finding of pretext,'" *id.* (emphasis in original), it has

11   indicated that there should be at least a "pronounced difference" between the plaintiff's and the other

12   person's qualifications in order for a plaintiff to survive summary judgment.  *See id.*

13        In the instant case, Mr. Finley has not provided sufficient evidence to establish that there is a

14   pronounced difference between his qualifications and Ms. Grant's.  In his declaration, Mr. Finley

15   lists "qualifications" that Ms. Grant allegedly does not have, *see* Finley Decl. ¶ 11, but, as the

16   County points out in its reply brief, Mr. Finley lists with such "specificity his work experience so

17   that his assertion that Ms. Grant did not possess the same qualifications might equally be said of

18   every other person on the planet in so far as it [is] unlikely that there exists another person who has

19   a[] background identical to Mr. Finley's."  Reply at 3 n.1.

20        In his declaration, Mr. Finley also makes assertions about Ms. Grant's limited experience

21   compared to his, but these assertions are largely inaccurate.  For example, Mr. Finley claims that

22   "Ms. Grant has no experience in correctional health care," Finley Decl. ¶ 12, but he has failed to

23   establish that he has any personal knowledge to make such a claim.  *See* Docket No. 115 (Def.'s

24   Obj. No. 14).  In fact, Ms. Grant's application for the Nurse Manager position establishes the

25   contrary.  She worked as Detention Registered Nurse for the County for almost two years and

26   employment as Nurse Supervisor for the County for more than four years).  *See* Grant Decl., Ex. 1

27   (application).  Other assertions made by Mr. Finley may be true – *e.g.*, that Ms. Grant has not been a

28   supervisor at any *other* correctional facility – but no reasonable jury could conclude that this creates

United States District Court

For the Northern District of California

1    a pronounced difference in qualifications since (1) Ms. Grant clearly had experience as a supervisor

2    at one of the County's correctional facilities (and for more than a short period of time) and (2) Ms.

3    Grant had experience as a supervisor in nonjail settings.  *See* Grant Decl., Ex. 1 (application) (listing

4    positions as charge nurse and nurse manager).

5            Of course, Mr. Finley argues that there is also a pronounced difference in qualifications

6    because he, unlike Ms. Grant, has a bachelor's degree.  Mr. Finley further contends that having a

7    bachelor's degree was one of the minimum qualifications required for the job as Nurse Manager;

8    thus, the County's decision to hire Ms. Grant instead of him is clearly suggestive of pretext.

9            The problem for Mr. Finley is that the document used by the County to assess minimum

10   qualifications – also known as the "class specification" or "job classification" – *see* Martinez Depo.

11   at 133; Martinez Decl. ¶ 3,[12] did not state that a bachelor's degree was required.  The class

12   specification stated in relevant part as follows:

13           <u>EMPLOYMENT STANDARDS</u>

14           Any combination of education and experience that would provide the
             necessary knowledge and abilities listed below.  *Typically*, equivalent
15           to four years of professional nursing experience, including at least
             three years of progressive management or supervisory experience in a
16           nursing position equivalent to Detention Nursing Supervisor and a
             bachelor's degree in Nursing or related field.

17

18   Martinez Decl., Ex. 2, at 2 (class specification) (emphasis added).  While "typically" the Nurse

19   Manager would have a bachelor's degree, the specification implies that that is not always the case

20   and hence not a prerequisite.  Furthermore, the actual job application makes clear that experience

21   may be substitute for a degree.  *See* Martinez Decl., Ex. 3 (supplemental application) ("Do you

22

23           [12] In his opposition, Mr. Finley never disputed that the class specification was the controlling
     document.  However, in his untimely filed objections, Mr. Finley argued for the first time that the class
24   specification was not the controlling document.  *See* Docket No. 118 (Obj. No. 13).  As noted above,
     all of Mr. Finley's objections are overruled because they are untimely.

25           Even if the Court were to consider the merits of this specific objection, the objection would be
     overruled.  Mr. Finley argues that Ms. Martinez provides no facts to show that she is knowledgeable,
26   qualified, or authorized to determine what was the controlling document.  But, as noted above, Ms.
     Martinez is a senior personnel analyst in the County's Human Resources Department.  *See* Martinez
27   Decl. ¶ 2.  Given her position, it is more than a fair inference that she would know what was the
     controlling document on minimum qualifications.

28

United States District Court

For the Northern District of California

1   possess a Bachelor's degree in Nursing or related field? . . . . [¶] If No, describe your qualifying

2   education and experience that you feel is equivalent to the degree.").

3          Mr. Finley points to County postings – sent internally and available to the public at large –

4   indicating that a bachelor's degree was required.  *See* Opp'n at 4 (referring to internal e-mail and

5   public flyer).  But there is no evidence that these postings prescribe the official specifications.  Mr.

6   Finley has offered no evidence to contradict the testimony of Ms. Martinez that the class

7   specification is the controlling document on minimum qualifications.  *See* note 12, *supra*.

8          Mr. Finley also notes that class specifications for *other* jobs specifically noted that

9   experience may be substituted for education, *see, e.g.*, Brown Decl., Ex. D at 249, 255 (class

10  specifications for other jobs), unlike the specification here.  That the County could have used more

11  explicit language in the class specification at issue does not detract from the plain language in the

12  class specification that "[a]ny combination of education and experience" providing the listed

13  knowledge and abilities is sufficient.  Martinez Decl., Ex. 2, at 2 (class specification).  And as noted

14  above, the class specification clearly states on its face that "typically" there will be a bachelor's

15  degree; the obvious implication is that this is not always or necessarily the case.

16         Mr. Finley further argues that the County's Chief of Administrative Services for HHS, Susan

17  Ketterman, has admitted that the class specification did not allow for substitution.  *See* Opp'n at 5.

18  This is a mischaracterization of Ms. Ketterman's testimony.  The entirety of the statement made by

19  Ms. Ketterman (during her interview with the investigator, Ms. Daube) was as follows:

20               Now here it doesn't say.  Sometimes they'll say, "You may
             substitute this one."  All it is saying is that typically it would be a
21           bachelor's degree in three years, of supervisory, four years of nursing
             experience.  Typically that would be it, but if you feel someone has the
22           knowledge, skills, and abilities that doesn't quite fit that, in this
             particular case you could qualify.
23

24  Brown Decl., Ex. E at 11 (interview of Ms. Ketterman by Ms. Daube).

25         Finally, the Court notes that Mr. Finley has produced no evidence that the decisionmakers in

26  fact believed that a bachelor's degree was required.  At bottom, to establish pretext, Mr. Finley

27  would have to demonstrate a discriminatory motive.  If the decisionmakers held an honest, good

28

                                                12

1    faith belief that a degree was not a prerequisite, even if legally or factually mistaken, such an error

2    would not establish or imply a discriminatory motive.

3          In sum, given the evidence of record, Mr. Finley has not produced evidence establishing a

4    "pronounced difference" (*Raad*, 323 F.3d at 1194) in qualifications between Ms. Grant and himself.

5    Accordingly, for the reasons stated above, Mr. Finley has failed to create a genuine dispute of

6    material fact on pretext based on the issue of qualifications.

7                              b.    Internal Policies or Procedures

8          Second, Mr. Finley argues that the County's explanation for its failure to promote him is a

9    pretext for race discrimination because the County failed to comply with its own internal policies

10   and procedures during the selection process.

11         The Ninth Circuit has acknowledged that an employer's deviation from established policy or

12   practice may be evidence of pretext. *See Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1214 (9th Cir.

13   2008). For example, in *Diaz*, an age discrimination case, the court noted that the alleged

14   discriminator had violated the company handbook by terminating the plaintiffs' employment without

15   considering their length of employment. The court emphasized:

16              Reasonable jurors could conclude that this irregularity further
                undermines the credibility of the proffered explanations for the
17              layoffs: if age was truly irrelevant to Brandt's decisionmaking, he
                presumably would not have failed to weigh the factor in the handbook
18              that weighed most heavily in favor of retaining older workers. The
                evidence is consistent with the view that Brandt disregarded company
19              policy because it conflicted with his intent to discriminate.

20   *Id.*

21         In the instant case, Mr. Finley argues that the County violated various policies or practices

22   during the selection process. As discussed below, most of the alleged violations clearly did not take

23   place, even when viewing the evidence in the light most favorable to Mr. Finley. For example:

24   ●    PMR[13] 31.1(B) provides that "[e]xaminations will be competitive, impartial, and practical in

25        character . . . ." Martinez Depo, Ex. 2 at DEF001433. According to Mr. Finley, this

26        regulation was violated because Ms. Stoker placed Ms. Clark on the selection interview

27   _____

28        [13] PMR is an acronym for Personnel Management Regulation.

United States District Court

For the Northern District of California

panel, even though Ms. Clark was likely biased against Mr. Finley or at least predisposed toward Ms. Grant.  Mr. Finley argues that throwing out Ms. Clark's scores was not good enough since she still could have had an influence on the other panelists; instead, a new panel should have been convened.  The problem with Mr. Finley's argument is that PMR 31.1(B) addresses the need for impartiality for examinations.  Here, Mr. Finley is not challenging an examination but rather a selection interview panel.[14]

- PMR 21.1(A)(2)(d) provides that "Marin County employees will be guided by the following requirements: . . . (c) Base decisions on employment on the principle of equal employment opportunity and diversity.  (d) Ensure that promotion decisions are in accord with principles of equal employment opportunity by imposing only valid requirements for promotional opportunities."  Colton Depo., Ex. 23 at DEF001372.  Again, Mr. Finley argues that this regulation was violated because of Ms. Clark's presence on the selection interview panel. There are several problems with this argument.  First, there is no indication that Ms. Clark had a racial animus.  Even if she were resentful of Mr. Finley's opposition to her earlier appointment, that matter was personal.  There is nothing to suggest she was motivated by racial considerations.[15]  Second, there is no evidence that Ms. Stoker put Ms. Clark on the panel knowing of her dislike of Mr. Finley or her favoritism of Ms. Grant in a deliberate effort to disadvantage him.  Absent any such evidence of a knowing attempt to deprive Mr. Finley of an equal opportunity, there is no violation of PMR 21.1(A)(2)(d).

- In her deposition, Ms. Martinez stated that typically an oral board "consists of three rater that are considered subject matter experts in the area that will ask some of our candidates, however many you have, a series of questions to rank them to go to the eligible list." Martinez Depo. at 124.  Mr. Finley contends that this practice was violated in his case

---

[14] Notably, PMR 31 generally talks about the examination process, not the selection interview process.

[15] The County points out that Ms. Clark herself is African American.  *See* Clark Decl. ¶ 9 (noting that she is "a black woman").  While the fact that one is of the same race as the alleged victim does not preclude racial prejudice against that person, Mr. Finley offers nothing to support any such prejudice on Ms. Clark's part here.

**United States District Court**
For the Northern District of California

1   because Lt. Lepinski – a person without any nursing experience – was part of the selection

2   interview panel.  This argument lacks merit because, in her deposition, Ms. Martinez stated

3   that this was the practice for the oral board and that there was no oral board for the Nurse

4   Manager position at issue in the instant case.  Ms. Martinez noted there is a difference

5   between the oral board and the selection interview process.  *See* Martinez Depo. at 124-25.

6   Moreover, it is not clear that Lt. Lepinski would not be considered an "expert" because, even

7   though he was not a nurse, he had experience in the jail setting where the Nurse Manager

8   would work.  Finally, even if there was a procedural violation, Mr. Finley makes no showing

9   how he was disadvantaged more than Ms. Grant as a result.

10  ●   PMR 33.3(A) provides that "[b]ackground review, including reference checks, will be

11      conducted prior to a conditional offer of employment and, in some cases, promotion."

12      Martinez Depo., Ex. 2 at DEF001445.  Mr. Finley argues that this regulation was violated

13      because no reference checks were conducted in his case.  *See* Finley Decl. ¶ 17 ("The

14      selection panel did not check my references or personnel file because my supervisors, Steven

15      Blair and Dr. Palmigiano, confirmed they were never contacted.").  Even if there were no

16      evidentiary problems with Mr. Finley's statement, *see* Docket No. 115 (Def.'s Obj. No. 23)

17      (arguing lack of foundation, speculation, and hearsay), the regulation on its face indicates

18      that only "in some cases" will reference checks be conducted for promotion.  The regulation

19      does not specify for which promotion cases reference checks are required.  The County

20      points out that a background check may not have been needed because both Mr. Finley and

21      Ms. Grant were long-time employees of the County.  *See* Stoker Decl. ¶ 9.  Mr. Finley has

22      not established that PMR 33.3(A) required a reference check here.  In addition, on its face,

23      the regulation states that a background review will be conducted only prior to a conditional

24      offer of employment or promotion.  That review occurs after the selection process.  It is not

25      part of the selection process about which Mr. Finley complains.  Finally, as above, Mr.

26      Finley does not point out how this requirement, if applicable at all, would have advantaged

27      him in the selection process.

28

**United States District Court**
For the Northern District of California

Although none of the regulations or practices discussed above appears to have been violated or disadvantaged Mr. Finley in the instant case, Mr. Finley has, in his papers, pointed to one regulation that was arguably violated. That regulation is PMR 33.5(A), which provides that, "[p]rior to appointment or promotion, the appointing authority will review the personnel file of candidates who are past or current employees." Martinez Depo., Ex. 2 at DEF001445. In the instant case, the appointing authority is Ms. Stewart. In her declaration, Ms. Stewart does not indicate that she reviewed the personnel files of Mr. Finley or Ms. Grant prior to making the hiring decision. She simply states that she accepted the recommendation of the selection interview panel. *See* Stewart Decl. ¶ 4. Thus, an inference could be drawn that Ms. Stewart failed to comply with the regulation.

But this violation is not enough to raise a genuine dispute of material fact as to pretext – *i.e.*, this evidence is not sufficient to raise a genuine factual issue regarding the County's stated motive for its failure to promote Mr. Finley. This is because Ms. Stewart was the person who violated the PMR, but Mr. Finley does not claim that Ms. Stewart was the alleged discriminator in his case. At best, Mr. Finley seems to be claiming that either Ms. Stoker, Ms. Clark, or both harbored a racial animus. These facts stand in contrast to the facts in *Diaz* where it was the alleged discriminator who had violated the company handbook and therefore the failure to comply with company policy was a legitimate reason to question the credibility of the employer's proffered explanation for the adverse employment action (*i.e.*, firing of the plaintiffs). Furthermore, the Court also notes that, at the hearing, Mr. Finley conceded that nothing in his or Ms. Grant's personnel file would have been material. And as noted above, both Mr. Finley and Ms. Grant were long-time employees of the County, thus lessening (if not obviating) the need for such review. Finally, it appears the required review of the personnel file need only occur prior to the promotion; it is not clear that this must be accomplished as part of the competitive selection process about which Mr. Finley complains.

In sum, Mr. Finley has failed to create a genuine dispute of material fact with respect to pretext based on the issue of violation of County policy. If there were any deviations from County policy, Mr. Finley fails to demonstrate how any such deviation disadvantaged him or provide a reasonable basis for inferring discriminatory motive or pretext.

United States District Court

For the Northern District of California

c.      Pattern of Practice of Failing to Promote

Mr. Finley's final argument is that there is a genuine dispute of material fact on pretext because the County in general – and HHS in particular – has a pattern or practice of failing to promote African American employees to the senior management ranks.  The pattern or practice evidence consists primarily of the County Affirmative Action Report for Fiscal Years 2002-2003 and 2003-2004 (dated October 14, 2004).[16]

Under Ninth Circuit case law, it is clear that evidence of a pattern or practice may be indicative of pretext.  For example, in a fairly recent opinion, the Ninth Circuit underscored that a college's poor record of placing African Americans in management positions within the admissions department was indicative of such.  *See Ross v. Brooks College*, No. 06-55076, 2009 U.S. App. LEXIS 16936, at *3-4 (9th Cir. July 29, 2009).  Likewise, in *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, (9th Cir. 2004), the Ninth Circuit indicated that the absence of black supervisors and managers in the workplace was evidence suggestive of pretext.  *See id.* at 1123.

The County argues, however, that pattern or practice evidence by itself is not enough to create a genuine dispute of material fact on the issue of pretext.  *See* Reply at 9.  It is true that, in both *Ross* and *McGinest*, there was evidence in addition to the pattern or practice evidence which led the court to conclude that there was sufficient evidence for the plaintiff to overcome summary judgment.  But that does not necessarily mean that pattern or practice evidence by itself is never sufficient to create a genuine dispute of material fact.  In *McDonnell Douglas*, the Supreme Court did not make any such limitation, simply noting that

> evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment.  On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in

---

[16] There is also deposition testimony by Ms. Martinez that she does not have any knowledge of any African Americans in managerial positions in HHS, *see* Martinez Depo. at 77, and a statement by Mr. Finley in his declaration that, "[a]t the time I applied in 2006, I was the only African American supervisor in the DHSS.  I am unaware of any African Americans that have been employed as managers in DHHS since I started my employment in 1999."  Finley Decl. ¶ 13.

United States District Court

For the Northern District of California

1    this case conformed to a general pattern of discrimination against
2    blacks.

3    *McDonnell Douglas*, 411 U.S. at 804-05.

4         Similarly, the Ninth Circuit does not appear to have made any such limitation either.  While

5    the Ninth Circuit has noted that, where a plaintiff is relying on circumstantial evidence (as opposed

6    to direct) to establish pretext, the evidence must be specific and substantial, *see Cornwell v. Electra*

7    *Cent. Credit Union*, 439 F.3d 1018, 1030-31 (9th Cir. 2006), the court has also indicated that pattern

8    or practice evidence by itself can be enough to establish pretext, at least in certain circumstances.  In

9    *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090 (9th Cir. 2005), the Ninth Circuit stated:

10            A plaintiff may meet the burden to show pretext using either
11       direct or circumstantial evidence.  Direct evidence is evidence "which,
         if believed, proves the fact [of discriminatory animus] without
         inference or presumption." . . . .
12
              Circumstantial evidence, in contrast, is evidence that requires
13       an additional inferential step to demonstrate discrimination.  It can
         take two forms.  First, the plaintiff can make an affirmative case that
14       the employer is biased.  For example, statistical evidence is
         circumstantial evidence that could, *if sufficiently probative*, point to
15       bias.  Second, the plaintiff can make his case negatively, by showing
         that the employer's proffered explanation for the adverse action is
16       "unworthy of credence."

17   *Id.* at 1094-95 (emphasis added); *see also Peters v. Shamrock Foods Co.*, No. CV

18   03-02578-PHX-JAT, 2006 U.S. Dist. LEXIS 1965, at *26 (D. Ariz. Jan. 17, 2006) (concluding that

19   "[t]he statistical evidence relied upon by the EEOC, and the Plaintiff, is too broad to provide

20   independent evidence of pretext").

21        The problem for Mr. Finley is that pattern or practice evidence is not enough automatically

22   to defeat summary judgment.  Whether pattern or practice evidence is sufficient to defeat summary

23   judgment depends on the quality of the evidence.  It must be "sufficiently probative" to point to bias.

24   *Coghlan*, 415 F.3d at 1094-95.  In *Aragon v. Republic Silver State Disposal*, 292 F.3d 654 (9th Cir.

25   2002), the Ninth Circuit underscored this point.  In rejecting the plaintiff's contention that there was

26   a genuine dispute of material fact because three of the four individuals who were laid off were white,

27   the Ninth Circuit explained as follows:

28

18

United States District Court

For the Northern District of California

[B]ecause the sample size is so small, we make no statistical inference of intentional discrimination.  In *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072 (9th Cir. 1986), to show pretext, an employee relied on the fact that four of the five employees laid off (out of 28 total employees) were African American.  We recognized that while "statistics have a place in disparate treatment cases, their utility 'depends on all of the surrounding facts and circumstances.'"  We declined to consider the employee's statistical evidence because "'statistical evidence derived from an extremely small universe' . . . 'has little predictive value and must be disregarded.'"  The problem with a small number, of course, is that slight changes in the data can drastically alter the result.

We encounter a similar problem with the small sample size here.  Furthermore, the statistics "'must show a stark pattern of discrimination unexplainable on grounds other than [race].'"  Aragon's statistical evidence presents no stark pattern, nor does it account for possible nondiscriminatory variables, such as job performance.  Thus, we find Aragon's statistics insufficient to raise an inference of racial discrimination.

*Id.* at 663.

In the instant case, the pattern or practice evidence submitted by Mr. Finley, as noted above, consists primarily of the County Affirmative Action Report for Fiscal Years 2002-2003 and 2003-2004 (dated October 14, 2004).   The report – attached to the Colton deposition as Exhibit 24 – is one created by the equal employment division of Human Resources for the County.  *See* Colton Decl. ¶ 3.  The purpose of the report is to determine whether a racial group is under-represented for purposes of outreach to that group for recruiting.  *See* Colton Decl. ¶ 3; *see also* Colton Depo. at 25 (noting that the report is prepared to, *inter alia*, track ethnic minorities to try to obtain labor market availability parity).

The report states that people of color are "underutilized" in five job categories, including "Officials/Administrators."  Colton Depo., Ex. 24 (Report at vi).  Underutilization is defined as "[t]he condition that exists when the gender or ethnic/racial composition falls short of the goals of the County.  Underutilization is consequential and has practical statistical significance *only* if the variance exceeds three people."  Colton Depo., Ex. 24 (Report at iv) (emphasis in original).  The category "Officials/Administrators" is defined as

[o]ccupations in which employees set broad policies, exercise overall responsibility for execution of these policies, or direct individual departments or special phases of the agency's operations, or provide

United States District Court
For the Northern District of California

specialized consultation on a regional, district, or area basis.  Includes: department heads, directors, assistant directors, chief assistant directors, deputy directors, sheriffs, risk managers, principal personnel analyst, fire chiefs and kindred workers.[17]

Colton Depo., Ex. 24 (Report) (located at Docket No. 112-8, at 39).  According to the report, "[p]eople of color are significantly underutilized as ***Officials/Administrators*** where the goal is 17.7% . . . but the actual is 8.9%."  Colton Depo., Ex. 24 (Report) (located at Docket No. 112-8, at 30).  For African Americans specifically, the goal for the Officials/Administrators category County-wide was 4%, but the actual was 0%.  *See* Colton Depo., Ex. 24 (Report) (located at Docket No. 112-8, at 41).  Similarly, for African Americans specifically, the goal for the Officials/Administrators category for the HHS department in particular was 4%, but the actual was 0%.  *See* Colton Depo., Ex. 24 (Report) (located at Docket No. 112-8, at 66).

In its papers, the County argues that the report is not enough to give rise to an inference of discrimination because the report is aspirational in nature – *i.e.*, it is not prepared for purposes of determining whether there has been discrimination but rather is prepared for purposes of determining whether there needs to be outreach to a racial group for recruitment purposes.  *See generally* Colton Decl.  But the legal requirements triggered by the report is not the point here.  Mr. Finley relies on the report to demonstrate there exists as a factual matter a pattern of discrimination which supports his claim of pretext.

---

[17] The County contends that the position at issue here – *i.e.*, Nurse Manager – does not fall into the Officials/Administrators category but rather falls into a different category, more specifically, the Professionals Category.

The Court acknowledges that, in her deposition, Carrie Ann Colton, the County's Equal Employment Officer, testified that (1) the Nurse Manager position did not necessarily fall into the Officials/Administrators category; (2) many supervisors in fact fall under the Professionals category; and (3) she believed the position would fall under the Professionals category.  *See* Colton Depo. at 46.  Notwithstanding this testimony, the Court concludes that it is still a factual issue as to whether the Nurse Manager position falls into the Officials/Administrators category or the Professionals category.  The definitions of the two categories leaves open the possibility that the Nurse Manager position falls into the Officials/Administrators category.  *See* Colton Depo., Ex. 24 (Report) (located at Docket No. 112-8, at 39).  Also, the County did not provide any documentary evidence establishing that the Nurse Manager position has in fact been put into the Professionals category.  For purposes of summary judgment, the facts must be viewed in Mr. Finley's favor.

1    In particular, based on underutilization of African Americans both within HHS and the

2    County generally in the position of Officials/Administrators, Mr. Finley contends that there is

3    sufficient evidence to raise an inference of discrimination in this case.  While the Court finds the

4    statistics troubling, it concludes that the limited statistical showing fails to establish evidence from

5    which pretext may be inferred for several reasons.  First, there is no evidence of any nexus between

6    the statistics and the hiring process in Mr. Finley's case.  There is no evidence that any of the

7    decisionmakers here were involved in prior hiring decisions which contributed to the

8    underutilization statistics described in the report.  Nor is there any evidence that the selections

9    procedures employed here contributed to those statistics.  Second, the Court has no information at all

10   about the sample size.  Indeed, there is no evidence about any absolute numbers at all.  Nor is there

11   is any evidence about the number of African American applicants, if any, for the positions in the

12   Officials/Administrators category.  The only evidence on this point is Mr. Finley's conclusory claim

13   that, "[a]ccording to the [County] Affirmative Action Reports, selection pools have been rich

14   enough with African American candidates."  *See* Finley ¶ 13.  But the County has objected to this

15   statement in Mr. Finley's declaration on the best evidence rule.  *See* Docket No. 115 (Def.'s Obj.

16   No. 16).  That objection is sustained.  Mr. Finley has not pointed to which parts of any Affirmative

17   Action Report or documents which state that selection pools have in fact been rich with African

18   American candidates.  Absent any quantitative information about the numbers hiring decisions made

19   and composition of the applicant pool, the information has little statistical value.  *Cf. Gay v.*

20   *Waiters' and Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 521, 551-52 (9th Cir. 1982)

21   (discussing statistical significance).  The Court further notes that Mr. Finley has offered no evidence

22   to suggest that lack of African Americans in upper management is unexplainable on grounds other

23   than race.  In short, there is almost no quantitative information necessary to inform whether the

24   percentages have any significance.  *Cf. Aragon*, 292 F.3d at 663.  Nor is there any qualitative

25   evidence suggesting a nexus between the statistics and what happened in Mr. Finley's case.  While a

26   strong statistical showing might obviate the latter, here the statistical evidence here is not

27   "sufficiently probative" to imply racial bias such that pretext may reasonably be inferred.  *Coghlan*,

28   413 F.3d at 1094-95.

United States District Court

For the Northern District of California

1          For the above reasons, the Court finds that there is no genuine dispute that the pattern

2   evidence offered by Mr. Finley is not sufficiently probative to constitute circumstantial evidence of

3   pretext.

4          5.       Alleged Statement by Ms. Zamarono

5          Finally, the Court notes that, at the hearing, Mr. Finley suggested that there was additional

6   evidence indicative of pretext beyond that expressly identified in his papers.  More specifically, in

7   his declaration, Mr. Finley claims that Ms. Clark told Rosemarie Zamarono – a nurse who worked in

8   his department and who also worked with Ms. Clark part-time in the San Francisco jail – that "'[i]t

9   didn't matter what he said, they weren't going to hire him.'"  Finley Decl. ¶ 18.  According to Mr.

10  Finley, this evidence undermines the credibility of the proffered explanations for the County's

11  failure to promote him.

12         The problem for Mr. Finley here is that the evidence is not admissible.  *See* Docket No. 115

13  (Obj. No. 26).  There are two layers of potential hearsay.  Although the alleged statement by Ms.

14  Clark arguably is not hearsay because it is an admission by a party-opponent, the alleged statement

15  by Ms. Zamarono to Ms. Clark is hearsay.  Ms. Zamarono's statement is not an admission of a party-

16  opponent because, although she made the statement during her employment with the County as a

17  nurse, the statement was not one "concerning a matter within the scope of the agency or

18  employment."  Fed. R. Evid. 801(d)(2)(D); *see also* Fed. R. Evid. 801(d)(2)(D), 1972 advisory

19  committee notes (noting "[a] substantial trend favor[ing] admitting statements related to a matter

20  within the scope of the agency or employment").  There is no evidence that Ms. Zamarono's

21  responsibilities included employment hiring or firing decisions.  *See, e.g.*, *Ramirez v. Gonzales*, 225

22  Fed. Appx. 203, 210 (5th Cir. 2007) (concluding that a secretary's comments "do not fall within the

23  party opponent exception because they concerned matters outside the scope of her employment,

24  since [the secretary] was not involved in the decision to terminate [the plaintiff]"); *Jacklyn v.*

25  *Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927-28 (6th Cir. 1999) (concluding

26  that statement of supervisor did not concern a matter within scope of supervisor's employment and

27  therefore was inadmissible hearsay because supervisor "was not involved in the actions that plaintiff

28  claims led to her constructive discharge"); *Krause v. City of La Crosse*, 246 F.3d 995, 1002 (7th Cir.

United States District Court

For the Northern District of California

1   2001) (concluding that assistant police chief was not acting within his scope of employment "when

2   he discussed the alleged motivations of members of the city's finance department in transferring

3   Krause to the back office[;] [t]o hold otherwise would hold a city accountable for statements made

4   by any city employee, and Rule 801(d)(2)(D) does not cast such a wide net"); *Williams v.*

5   *Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir. 1998) (holding that the repetition of statements by

6   women employees other than the plaintiff was inadmissible because, "although the women knew the

7   outcomes of the managerial decisions at issue and the effects that those decisions had on them, the

8   decisionmaking process itself – which is the relevant issue in proving a pattern or practice of

9   discrimination – was outside the scope of the women's agency or employment"); *Breneman v.*

10  *Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986) (finding statements not within scope of

11  employment when declarants relating what decision maker said were not involved in the company's

12  discharge of plaintiff).

13              a.    Summary

14          In summary, because Mr. Finley has failed to establish a genuine dispute of material fact on

15  the matter of pretext, the Court grants the County's motion for summary judgment on the disparate

16  treatment claim.

17  C.   Retaliation

18          In his opposition to the summary judgment motion, Mr. Finley sets forth two theories

19  supporting his claim for retaliation.  First, he argues that the County retaliated against him in

20  violation of Title VII and FEHA when it transferred him from the juvenile hall to the adult facility

21  after he had made an internal complaint to Ms. Kettman on June 20, 2006 (soon after the selection

22  panel interview), about the process not being objective.  Second, he argues that the County retaliated

23  against him in violation of both statutes when, after he had made an internal complaint of

24  discrimination to the County's EEO office in July 2006 following Ms. Grant's selection, the County

25  failed to adequately, reasonably, and objectively investigate his claim of discrimination.  *See* Opp'n

26  at 25-26.  Each of the theories is discussed below, following a discussion of the applicable legal

27  standards for retaliation claims.

28

United States District Court

For the Northern District of California

1    1.    Legal Standard

2        Under Title VII, "[i]f shall be an unlawful employment practice for an employer to

3   discriminate against any of his employees or applicants for employment . . . because he has opposed

4   any practice made an unlawful employment practice by this title [42 U.S.C. § 2000e to § 2000e-17],

5   or because he has made a charge, testified, assisted, or participated in any manner in an

6   investigation, proceeding, or hearing under this title."  42 U.S.C. § 2000e-3(a).  "To establish a

7   prima facie case of retaliation [under Title VII], a plaintiff must demonstrate: (1) a protected

8   activity; (2) an adverse employment action; and (3) a causal link between the protected activity and

9   the adverse employment action."  *Cornwell*, 439 F.3d at 1034-35.

10       Like Title VII, FEHA bars an employer from "discharg[ing], expel[ing], or otherwise

11  discriminat[ing] against any person because the person has opposed any practices forbidden under

12  this part or because the person has filed a complaint, testified, or assisted in any proceeding under

13  this part."  Cal. Gov't Code § 12940(h).  And as with Title VII, "in order to establish a prima facie

14  case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected

15  activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal

16  link existed between the protected activity and the employer's action."  *Yanowitz v. L'Oreal USA,*

17  *Inc.*, 36 Cal. 4th 1028 , 1042 (2005).

18       Substantively, however, there is a difference between Title VII and FEHA law on retaliation.

19  That difference concerns what constitutes an adverse employment action.  Under Ninth Circuit law,

20  an adverse employment action for purposes of a Title VII retaliation claim is an action " reasonably

21  likely to deter employees from engaging in protected activity."  *Ray v. Henderson*, 217 F.3d 1234,

22  1243 (9th Cir. 2000).  In contrast, an adverse employment action for purposes of a FEHA retaliation

23  claim is an action that "materially affects the terms, conditions, or privileges of employment, rather

24  than simply that the employee has been subjected to an adverse action or treatment that reasonably

25  would deter an employee from engaging in the protected activity."  *Yanowitz*, 36 Cal. 4th at 1051 &

26  n.10 (noting that "[t]he Ninth Circuit is the only federal Court of Appeals to adopt this [latter]

27  standard").

28

2.      Transfer

As noted above, Mr. Finley's first theory of retaliation is based on his transfer to the adult facility, which was done after he had complained about the selection interview panel process to Ms. Kettman on June 20, 2006.  Contrary to what the County argues in his reply brief, this is not a brand new theory presented for the first time in opposition to the summary judgment motion.  Rather, Mr. Finley's supplemental response to Interrogatory No. 2 sufficiently implicates this theory.  *See* Kiernan Decl., Ex. 6 (supplemental response to Rog No. 2) (discussing Mr. Finley's objection to Ms. Clark being placed on selection interview panel, after which he was transferred to the adult facility).

That being said, there is a more fundamental problem with Mr. Finley's first theory of retaliation.  That is, the complaint that he made to Ms. Kettman about Ms. Clark being on the selection interview panel does not constitute protected activity under either Title VII or FEHA.  As noted above, a protected activity under Title VII is opposition to any practice made unlawful by Title VII or participation in a proceeding under Title VII.  A protected activity under FEHA is similarly defined.  In his complaint to Ms. Kettman, Mr. Finley did not make any charge of racial discrimination or harassment.  Rather, his concern was that Ms. Clark might be biased against him because he had objected to her being instated as interim Nurse Manager and because she was predisposed to Ms. Grant, apparently having said that she was grooming Ms. Grant for the position. *See* Stoker Decl. ¶ 8 & Ex. 2 (e-mail exchange).  While the complaint may have raised an issue of fairness, it did not assert discrimination and hence did not constitute protected activity under either Title VII or FEHA.

Accordingly, the Court need not address the issue of whether the transfer to the adult facility involved more work for the same amount of pay and thus constituted an adverse employment action.

3.      Daube Investigation

Mr. Finley's second theory of retaliation is that the County failed to adequately, reasonably, and objectively investigate his claim of discrimination after he had made an internal complaint of discrimination to the County's EEO office in July 2006.

As a preliminary matter, the Court notes that Mr. Finley has not provided any precedent in which any court has held that a failure to conduct an adequate investigation after an alleged act of

United States District Court
For the Northern District of California

discrimination is an action that "materially affects the terms, conditions, or privileges of employment" under FEHA or constitutes an adverse action or treatment that reasonably would deter an employee from engaging in the protected activity under Title VII.  The instant fact pattern seems far removed from the more conventional situation where the complaining employee is subject to an affirmative detriment following the exercise of protected activity.[18]  *See, e.g.*, *Coszalter v. City of Salem*, 320 F.3d 968, 976-77 (9th Cir. 2003) (case in which employee subject to, *inter alia* "an unwarranted disciplinary investigation (# 4); an unwarranted assignment of blame (# 6); . . . a criminal investigation (# 15); . . . a withholding of customary public recognition (# 26); . . . and two consecutive ninety-day 'special' reviews of work quality").

Assuming arguendo that an inadequate post-complaint investigation may constitute an adverse action, there are further problems with Mr. Finley's claim.  First, some of the alleged inadequacies with the investigation are questionable.  For example, Mr. Finley argues that the Ms. Daube, the attorney hired by the County to do the investigation, "unilaterally limited her investigation to exclude any statistical information pertaining to discrimination in the promotion process at the County."  Opp'n at 26.  Mr. Finley makes this charge based on statements that Ms. Daube made during her interview of Ms. Kettman.

> Q.   Now, one of his allegations that it's sort of an adverse impact kind of thing, and I basically said I wasn't going to be pursuing that.  I'm looking at his claim that he was passed over for promotion and he believes he's more qualified, and the only reason that he believes that he was passed over is because of his national origin and race.
>
> He has suggested that he's looked around, and he's noticed that this [sic] are no quote, unquote, "persons of color" in upper management in Health & Human Services.
>
> A.   That's not true.
>
> Q.   Okay.  Do you have statistics, I'm assuming –
>
> A.   We don't have enough, but –
>
> Q.   Well –

---

[18] Mr. Finley has not cited any case where *e.g.*, mere inaction on the part of an employer in response to the employee's claim of discrimination has been held to constitute "adverse action" for purposes of retaliation.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A.     – actually, we've met parity in every –

Q.     Okay.

A.     Just recently, particularly in (inaudible), we've finally reached parity, you know, as a goal but, yeah, we can give you all of that.  But we do have an African-American on the executive team.

Q.     Yeah.

A.     And that's only one out of ten, but better than it was.

Q.     That's okay.  Yeah.  And my position on these things is that I'm not here to investigate, you know, the numbers or what that looks like or anything else, what I suggested to him, you know, my scope is to find out why A over B –

A.     Uh-huh.

Q.     – and to look at the validity of your claim.

A.     So how else can you ascertain that, because in some past investigations when someone has claimed national origin or race –

Q.     Uh-huh.

A.     – you know, we've looked at hiring patterns.

Q.     Uh-huh.

A.     You know, past recruitments in the same classes as such, probably because those are broader classes, and this is –

Q.     Yeah.  And how I treat it –

A.     Uh-huh.

Q.     – both as a litigator and, from time to time, doing this end of it, if someone makes that claim, first of all, I look at their discrimination claim and I look at the merits of that.

       The only thing that the numbers will reflect, you know, perhaps will support, if you've got some evidence there –

A.     Uh-huh.

Q.     – that says, yeah, you know, it looks – it's usually a mixed motive thing.  "Well, we didn't put him in there because of this," but – and if that looks pretty legitimate, then the numbers really are sort of irrelevant to the whole scheme of things.

A.     Just curious.

United States District Court

For the Northern District of California

| | | |
|---|---|---|
| 1 | Q. | Yeah.  That's kind of how you look at it.  The whole – back |
| 2 | | when I had been doing this for 24 years, but back in the days when there were lots of challenges made to fire and police |
| 3 | | departments, working in the Department of Justice and so forth, there you would get into a numbers game. |
| 4 | | |
| | A. | Okay. |
| 5 | | |
| | Q. | You know, which usually meant, and I've defended a couple of |
| 6 | | these, that you were looking at outreach efforts – |
| 7 | A. | Uh-huh. |
| 8 | Q. | – because that's usually – the Department of Justice came in, |
| | | and they were looking at this, this, and this, and they'd say, |
| 9 | | "Well, you're not . . . ." |

10  Brown Decl., Ex. E at 46-48 (interview of Ms. Kettman by Ms. Daube).

11      As indicated by the above, arguably, there is insufficient evidence to suggest that Ms. Daube

12  "unilaterally limited her investigation to exclude any statistical information."  Opp'n at 26.  In fact,

13  Ms. Daube specifically asked Ms. Kettman about whether or not she had any statistical information.

14  While, admittedly, Ms. Daube said she was not there to investigate the numbers, that statement

15  needs to be placed in context.  In context, Ms. Daube was stating that she was not investigating a

16  disparate impact claim but rather a disparate treatment claim.  To be sure, Ms. Daube's statement

17  that numbers become irrelevant (if there is a legitimate nondiscriminatory reason for an employer's

18  action) is troubling, and may suggest that Ms. Daube failed to give any consideration to the

19  statistical evidence that Mr. Finley provided.  On the other hand, as discussed above, the statistical

20  evidence is in fact insufficient to give rise to an inference of discrimination.

21      In any event, even if Ms. Daube did conduct a flawed investigation or was biased,[19] that

22  deficiency is not attributable to the County.  Ms. Daube was retained as an independent contractor to

23  conduct the investigation; she was not a County employee.  Unless the County knew or should have

24  known of the problems with the investigation, there is no basis to charge the County with retaliation.

25  Mr. Finley has pointed to nothing on the face of the report prepared by Ms. Daube which shows that

26

27      [19] See Finley Decl. ¶ 26 (claiming that Ms. Daube "openly dismissed my complaint stating that
28  whether she thought 'the Oakland Raiders football team was losing because it had a black head coach'").

**United States District Court**
For the Northern District of California

1   it was patently flawed or biased.  There is no evidence to suggest that the County knew of any

2   exclusion of statistical evidence or any racist remark by Ms. Daube.  In short, there is no evidence

3   suggesting bad faith by the County.

4        To the extent Mr. Finley argues that the County should be held liable because it hired Ms.

5   Daube to do a "litigation assessment" rather than to conduct "a fair and impartial investigation" of

6   his discrimination complaint, Opp'n at 26, that argument is not persuasive.  Mr. Finley's claim that

7   Ms. Daube was hired to a litigation assessment is based solely on a billing record entry made by Ms.

8   Daube.  *See* Brown Decl., Ex. D ("Drafted litigation assessment of Finley's claims").  There is no

9   evidence that the County intended or anticipated the investigation was undertaken as a defensive

10  litigation tool or assessment rather than a fair and impartial investigation of Mr. Finley's

11  discrimination complaint.  Indeed, although as noted above one of Ms. Daube's time entries refers to

12  a litigation assessment, the very next time entry characterizes the report as an investigative report ,

13  and the report is also titled an "Investigative Report."  *See* Brown Decl., Ex. D.

14       Accordingly, the Court concludes that there is no genuine issue of material fact on Mr.

15  Finley's retaliation claim and the County is entitled to summary judgment.

16  D.   Racial Hostile Work Environment

17       1.   Legal Standard

18       Under both Title VII and FEHA, a claim for a race-based hostile work environment is viable.

19  *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (noting that a claim for a

20  hostile workplace may be premised on race); *Aguilar v. Avis Rent A Car System, Inc.*, 21 Cal. 4th

21  121, 129 (1999) (stating that "[o]ne form of employment discrimination is harassment on the basis

22  of race or national origin").  Under both statutes, Mr. Finley can survive summary judgment only if

23  he "raise[s] a triable issue of fact as to whether (1) [he] was subjected to verbal or physical conduct

24  because of [his] race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or

25  pervasive to alter the conditions of [his] employment and create an abusive work environment."

26  *Lockett v. Bayer Healthcare*, No. C 05-03978 CRB, 2008 U.S. Dist. LEXIS 16173 , at *23 (N.D.

27  Cal. Mar. 3, 2008); *see also Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 871-72 (9th Cir. 2001).

28

2.      Conduct Based on Race

In his opposition, Mr. Finley notes that the offensive conduct at issue need not be explicitly racial in nature.  *Cf. Accardi v. Superior Court*, 17 Cal. App. 4th 341, 348 (1993) (stating that, "[t]o plead a cause of action for this type of sexual harassment, it is 'only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff "had been a man she would not have been treated in the same manner"'").  While this statement is accurate, Mr. Finley cannot sidestep the requirement that the offensive conduct must still be based on race.  In other words, if the offensive conduct does not have an express racial overtone, then there must be some basis from which a reasonable jury could infer that the harassment was because of Mr. Finley's race.  Title VII prohibits a race-based hostile environment, not an environment that is generally hostile.

In the instant case, Mr. Finley describes the offensive conduct that created a hostile work environment in his case as follows: (1) the racist remark made by Ms. Daube during her investigation of his discrimination complaint; (2) a statement made by Chris Schuepbach, a County employee who worked in the HHS Department as a personnel manager, that, "'in my job, you have to be careful because you get people who don't get promoted and then complaint and try to sue the County [–] I got to deal with those kinds of troubled employees'"; (3) the repeated abrasive and angry treatment of Mr. Finley by his supervisors; and (4) his transfer to the adult facility.  Opp'n at 27.

While the conduct described in (1) above, if true, is race-based, for the reasons stated above Ms. Daube's comments as an independent investigator not an employee or one supervised by the County cannot be attributable to the County.  There is no evidence that the County was aware of the alleged comment.

Although a stretch, the conduct described in (2) above arguably has a racial component as well since Mr. Schuepbach made the statement after Mr. Finley had appealed the hiring decision.  *See* Schuepbach Decl. ¶ 3 (stating that "it struck me that because [Mr. Finley] had filed a selection appeal he may have been offended by my comments regarding difficulties with employee's [sic] appealing").

United States District Court

For the Northern District of California

30

United States District Court
For the Northern District of California

1    However, as to the remaining conduct, there is no basis upon which a reasonable jury could

2    infer that the conduct (assuming that it took place) was based on race.  For example, Mr. Finley does

3    not identify any harassment that was explicitly directed at his race.  Nor does he identify any

4    particular supervisor who allegedly harbored racial animus from which any abusive treatment would

5    be attributable to race.  Title VII does not prohibit a hostile working environment; it prohibits a

6    racially based hostile environment.

7    As for the decision to transfer Mr. Finley, Mr. Finley has failed to produce any evidence

8    rebutting the County's evidence that Mr. Finley's transfer was based solely on financial

9    consideration.  The evidence reflects that, because of budget concerns, the elimination of Mr.

10   Finley's position as a Nursing Supervisor and consolidation of the adult and juvenile facility

11   supervision was contemplated as far back as 2005 with the Page Report.  *See* Grant Decl. ¶ 7; *see*

12   *also* Stewart Decl. ¶ 5 (noting that Page Report stated "there was no need for a supervising nurse at

13   the juvenile hall"); Stoker Decl. ¶ 11 (noting that Page Report recommended that Detention Nursing

14   Supervisor position at juvenile hall be eliminated because too few nurses there to justify having

15   manager on site).  While, as Mr. Finley points out, the Board of Supervisors had not adopted a

16   budget at the time of his transfer, there is no evidence rebutting the County's assertion that officials

17   had not already contemplated the elimination of the position well in advance.

18   Mr. Finley has failed to submit evidence of race-based conduct sufficiently severe or

19   pervasive to alter the conditions of Mr. Finley's employment and create an abusive work

20   environment.  *See, e.g.*, *Vasquez*, 349 F.3d at 642-43 (concluding that ""[t]he allegedly harassing

21   incidents, which occurred over the course of more than one year and only two of which contained

22   racially related epithets, did not create a hostile work environment for [the plaintiff]"); *Kortan v.*

23   *California Youth Authority*, 217 F.3d 1104, 1107, 1111 (9th Cir. 2000) (concluding that there was no

24   hostile work environment when a supervisor called female employees 'castrating bitches,'

25   'Madonnas,' or 'Regina' on several occasions in plaintiff's presence; the supervisor called the

26   plaintiff 'Medea'; the plaintiff complained about other difficulties with that supervisor; and the

27   plaintiff received letters at home from the supervisor because the supervisor's conduct was not

28

United States District Court

For the Northern District of California

1    severe or pervasive enough to unreasonably interfere with the plaintiff's employment).  Therefore,

2    the County is entitled to summary judgment on the hostile work environment claim.

3    E.      Failure to Prevent Discrimination and Harassment

4            Because the Court has granted summary judgment to the County on both the disparate

5    treatment and the hostile work environment claims, the claim for failure to prevent discrimination

6    and harassment is likewise dismissed.

7    F.      Violation of 42 U.S.C. §§ 1981, 1983, and 1985

8            In its motion for summary judgment, the County challenges each of the civil rights violations

9    pled in the complaint pursuant to §§ 1981, 1983, and 1985.

10           1.      Section 1981

11           With respect to the § 1981 claim, the County argues that it is entitled to summary judgment

12   because § 1981 requires that there be a contract between the plaintiff and the defendant, *see* 42

13   U.S.C. § 1981 (providing that "[a]ll persons within the jurisdiction of the United States shall have

14   the same right in every State and Territory to make and enforce contracts"), and, in California,

15   public employment is held by statute.  *See Miller v. State of Cal.*, 18 Cal. 3d 808, 813 (1977) (stating

16   that "it is well settled in California that public employment is not held by contract but by statute").

17   In his opposition, Mr. Finley does not dispute this argument.  Accordingly, the Court grants the

18   County's motion for summary judgment on the § 1981 claim.

19           2.      Section 1985

20           For the § 1985 claim, the County argues that it is entitled to summary judgment because the

21   statute requires that there be a conspiracy, *see* 42 U.S.C. § 1985, and the County cannot conspire

22   with itself.  *See Habhab v. Hon*, 536 F.3d 963, 969 (8th Cir. 2008) (concluding that plaintiff's §

23   1985 claim failed because "a government entity or corporation cannot conspire with itself");

24   *Richmond v. Board of Regents of University of Minnesota*, 957 F.2d 595 (8th Cir. 1992) (concluding

25   that an employee could not maintain an action under § 1985 because a corporation could not

26   conspire with itself through its agents when the acts of the agents were within the scope of

27   employment).  As above, Mr. Finley fails to dispute this argument.  Accordingly, the Court grants

28   summary judgment on the § 1985 claim, too.

1    3.    Section 1983

2    In his FAC, Mr. Finley asserts a violation of § 1983 based on three constitutional provisions

3    – *i.e.*, the First Amendment, the Equal Protection Clause, and the Due Process Clause.  In the

4    currently pending motion, the County makes arguments as to why the § 1983 claim cannot survive

5    summary judgment to the extent it is based on either the First Amendment or the Due Process

6    Clause.  Mr. Finley fails to address these arguments in his opposition, thus effectively conceding

7    them.  Therefore, the Court grants summary judgment to the County on the § 1983 claim to the

8    extent it is based on the First Amendment and the Due Process Clause.

9    As for the remaining § 1983 claim based on the Equal Protection Clause, the County's main

10   contention is that there is no evidence of intentional discrimination.  The County notes that Mr.

11   Finley's equal protection claim is effectively the same as his claim for disparate treatment; therefore,

12   "[i]f the Court dismisses Plaintiff's second cause of action for disparate treatment . . . , it must also

13   dismiss this Plaintiff's equal protection cause of action."  Mot. at 27.  In short, the equal protection

14   claim rises or falls with the claim for disparate treatment.  Mr. Finley does not dispute such in his

15   papers.  Accordingly, because the Court grants summary judgment on the disparate treatment claim,

16   it also grants summary judgment on the § 1983 equal protection claim.

17   G.    Violation of California Constitution, art. I, § 7

18   Article I, § 7 of the California Constitution provides in relevant part that "[a] person may not

19   be deprived of life, liberty, or property without due process of law or denied equal protection of the

20   laws."  Cal. Const., art. I, § 7(a).  Again, because the Court is granting summary judgment on the

21   disparate treatment claim, this claim too must be dismissed.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

United States District Court
For the Northern District of California

1

**III.    <u>CONCLUSION</u>**

2    For the foregoing reasons, the Court grants summary judgment to the County on each of the

3   claims asserted in the FAC.  The Court therefore orders the Clerk of the Court to enter judgment in

4   favor of the County and close the file in this case.

5    This order disposes of Docket No. 94.

6

7    IT IS SO ORDERED.

8

9   Dated:  December 23, 2009

10   _____

11   EDWARD M. CHEN
    United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California